dialogues Thank you strong. You may proceed. Thank you, your honors. I may please the court. David B. Owens from the Exoneration Project on behalf of Marvin Wilford. His family is here today. Wilford's conviction for the murder of Delwyn Foxworth must be vacated. This should not be a close call. For one, the conviction is based centrally on the greatest source of wrongful convictions in the United States, an eyewitness identification. Social science confirms the unreliability of the identification here. Moreover, no physical evidence ever linked Wilford to this extremely messy crime. In fact, the murder weapons were tested and they powerfully advanced Wilford's claim of innocence. How is that? How did they advance his claim of innocence? The DNA results here advance Mr. Wilford's claim of innocence in a number of ways. So first, the two by four that was described as being used by the perpetrator, T, by the lone eyewitness, was tested for, was subject to DNA testing. And all of the DNA testing on that two by four excluded Mr. Wilford completely. Let me stop you here and ask you this question that follows from that. In the DNA evidence, I mean, arguably would weigh in the defendant's favor the absence of it, but the jury in the first case was told that there was no DNA evidence ever linking the defendant to this crime. So how does the new evidence bear on that issue? It establishes there's nothing to link him to the crime. There's the DNA evidence from the original trial and the status of the DNA evidence today is night and day. So as it relates to the two by four. Well, what the jury was told, there was no DNA evidence in the first trial. At the first trial related to the jury was told that there was on the two by four, it had the victim's blood on it. And so what is, there's a substantially more that we know about that evidence itself. There's somebody else's DNA on the board. Is that it was the victims, which is not surprising in a crime like this where the victim was struck with the board. So that, of course, does not, that's not a big deal in terms of being substantially exculpatory. However, now you have mixed with the victim's DNA, you have a mixture that is, was, was not Williford. And in fact, there was another profile there. And that, that profile belongs to the, what the individual ident, we've referred to as identified number, male number one, which was a DNA hit to another case. Some tests, I mean, the eyewitness said there were three people that handled the board, right? Correct, Your Honor. Okay. So does that bear on there? Well, so that, well, that does substantially because of who the DNA hit is too. So there's a case link here to rape and murder another individual. And though that person hasn't been found and should be found, that evidence substantially corroborates that Mr. Williford's innocence. This is a complete game changer, but that's not the only thing. As the court noted, there, there was purported to be a multiple perpetrator offense. There's additional DNA on the board. So for example, the crime lab deduced a profile, also from a mixture of the victim's blood, which was from stain D. So there's another person who's on the murder weapon, whose DNA is there mixed with the victim's blood. This substantially corroborates Mr. Williford's innocence. There's, again, there was two other stains, stains D and G, that were also mixtures with Boxworth's blood and that could not be Williford. And so when you look at the evidence that was presented at trial, starting just with the two by four alone, it is the, the evidence on the murder weapon is the victim's blood. That's easy. Now you have three different profiles mixed with the perpetrator, excuse me, mixed with the victim's blood that is, cannot be Mr. Williford and would allow him reliably to say that those are the individuals who committed the crime. Let me explain. So you're saying there's four different on that board now? Well, so... Victims plus three others? There was a little bit, this is, the DNA evidence in this case is largely uncontested. There was one small dispute about this in the court below. So the testimony was that the, whether or not what I just referred to as stains D and G were also, were consistent with coming from stain D. So for example, the dispute is whether or not, on our perspective, stains D and G are subset of D. So it's, you've got the victim's DNA there, which is unsurprising, and then you've got unidentified male number one, and then you've got stain D, who shows up residually in stains D and G. Was this, was this issue covered at the original trial? This issue wasn't explored at the original trial. The DNA evidence was submitted by stipulation because it wasn't significant to the case. And in fact, the record supports that here. Jed Stone, the trial attorney, in his affidavit below, said the reason it was submitted via stipulation was because it was not significant. So there was no crime lab expert to testify to the DNA in the first trial? No, there was not. This was all, all of the evidence in this case was submitted via stipulation because the central issue in the case was the identification by Ms. Connors of Mr. Williford as being T. So the, the DNA evidence here is a complete game changer. And Well, well, the trial court made a determination in this case that your argument is based on two faulty assumptions. One is that only the perpetrators handled that board. And two, that every time someone handles something, DNA profile is lucky. Now how do you respond to that? Well, we, we specifically did not make those assumptions, Your Honor, and we believe it was manifest error for the trial court to reach that conclusion. First, the fact that the, our, our, our argument is based upon the testimony that was presented at trial. The eyewitness present, testified that all three of the assailants, the perpetrators of this crime, handled this two by four. And in fact, the T was the last person to hold it. The two by four was identified and introduced by pictures at, at trial. So this is one of the items, the murder weapons, for lack of a better word. And so the assumption that only those individuals handled it is not the one we've made. We are saying the the identificate, or excuse me, the evidence at trial was that the perpetrators handled this. We did DNA testing on it. There's mixtures with the victim's blood and DNA. He had two other individuals. Well, correct. And that's important because this is a three perpetrator crime. Right. But there's not three perpetrators DNA. There's the victim and two perpetrators. Right. On, on our, on our reading it's, it's two and on the State's it's three. Regardless, this substantially advances Mr. Williford's claim of, of, of actual nonsense. The DNA need not be completely dispositive. Instead it needs to present, go to the ultimate issue in the case. And it certainly goes to the ultimate issue in the case because the testimony at trial was that the perpetrators handled the two by four and used it to strike the victim. And given that and it's certainly the case as this court has previously held that DNA does not trump all other evidence. And we certainly did not make that argument below. And we certainly did not make the argument that necessarily every single time somebody touches something that there will be DNA there. However. You can see that as in, I think it was the Dodds case, you can see that just because somebody touches something doesn't necessarily, they're going to leave DNA. Correct. And that's also and I was referring to the court's decision in Rivera as well. And in that case, however, the, what this court held was that DNA can be nonetheless significant because it can give a reasonable doubt as to the identity of the perpetrator. So in, in Rivera the court specifically rejected the argument that DNA trumps everything and it's an end all and be all. And we're not making that argument. However, the fact that there, that Connors testified at the trial that the perpetrators used this, the two by four to bludgeon the victim. And the fact that there's the stains on the two by four mixed with the evidence. And the fact that Wolliford's claim that he is actually innocent. Counsel, let me, let me stop you and ask you this. What is the standard of review to succeed in a claim of actual innocence? What must be established under the case law? What must be established? Yeah. And, and on this, I think it's straightforward. The Illinois Supreme Court addressed this in People Against Coleman in 2013. The evidence must be new, non-cumulative material, and conclusive enough, when addressed collectively, with all of the new evidence, to probably change the result on trial. And so it need not, you know, remove every, it need not be completely exonerating in the sense that there's not a, a scintilla of a possibility that the, there's an alternative scenario. Instead, what this court has held in Starks and the First District held in Waters, does the DNA go to the ultimate issue of whether or not, and to create a reasonable probability that a jury could see the case differently. And the case as it exists now, is completely different than the case that was tried. I should mention, as related to the DNA, that there was other DNA tests conducted from the gas can that was recovered from the scene. That also doesn't lead to Williford. And then also, after there was this, this alarming, shocking DNA hit to the Holly Staker case, the task force, the Northern Illinois Regional Task Force, went around and did a bunch of additional DNA testing. And they tried to get swabs to, to try to prove that one of these other people was, Williford or one of his affiliates was connected to the case in some way. And it didn't link to the case whatsoever. So the... Let me ask you this. Rather, you raised several other issues in your brief. Yes. Rather than spend all of your time in the DNA, is there something you want to tell us about this eyewitness identification issue? Absolutely. I appreciate the transition. And the... In addition to the DNA evidence, as it relates to our actual instance claim, the social science concerning the fallibility and reliability of eyewitness testimony is part of our actual instance claim as well. So again, the standard is the same. Is it new, non cumulative material, and when at the end considered with the other evidence, conclusive. And here, there's, I think, no dispute that the law at the time of the trial in Illinois was that social science concerning eyewitness identification was not looked upon favorably and the court was... But he could have still brought it up. It could have been brought up. Because of LRMA. And that's our position, is that LRMA is new and that the NAS report identified... I mean, before LRMA, you could have brought it up. I mean, Enos in 1990 left the door open for you to bring this up. Enos did leave it open, but I do think that in terms of the social science understanding that was discussed in LRMA, it says that there has been a significant sea change in terms of this acceptance of the social science... But I mean, the social science issue in this case relates to the suggestive nature of the Shaw identification, correct? Correct. Wasn't that presented to the jury? I mean, didn't Mr. Stone argue the suggestive nature of that picture? Well, there's two things, Your Honor. So one, Mr. Stone didn't bring up the 2002 confrontation, which happened in September of 2002, where Ms. Connors was shown the same picture from the first identification. So that didn't come out at trial and we didn't allege that as an effective... You mean the younger defendant versus the older? Correct. So just to take a step back, in... It was the second time she was shown the picture. Correct. And then... The same picture, the other picture. Correct. So she was shown that picture twice and then there was the 2003... And so that didn't... Wasn't presented at trial, but the reason that the social science, whether the court views it through the lens of actual innocence, which we believe it should be presented, or through the lens of due process, or through the lens of ineffectiveness in some counsel, the issue here is that social science concerning eyewitness identification is highly counterintuitive. And so it would substantially advance the case of innocence for Mr. Willeford. And this is the... There's a reason the Illinois Supreme Court in Lerma recognized the power of this testimony, because it tells us why eyewitness identifications are not as reliable as we might think. While we're on that topic, on the hearing of the petition, didn't Dr. Woff just testify? Yes, Your Honor. As I was reading the record, did he ever interview the alleged eyewitness? No. And why didn't he interview the eyewitness? That's not done in the field. So I would... The testimony that the Illinois Supreme Court endorsed in Lerma and the types of evidence that is typically given allows the expert to talk about the phenomenon and how memory and perception works. And then it's... Why wouldn't it have been helpful to talk to the actual eyewitness to determine if there were some infirmities or problems with this identification? Would it be irrelevant to know what the eyewitness was thinking at the time? Actually, it would, because... So if Dr. Loftus interviews... And this did come up, actually, at the below, interviews a witness 15 years after that information is not particularly reliable, because of how the memory works. So there's two things that... Yeah, but it might uncover some problems with the show. If it might have uncovered a lot of facts, it could be relevant. Why would you not want the victim, the witness, to be identified before the interview? Well, because the post... What I was gonna say was the post event information that influences and becomes integrated or contaminated with a witness's memory, it can't be undone, and that's one of the problems that happened at the trial court here. The trial court in post conviction said, I find that the... Any suggestiveness is just undone. The trial court didn't hear any evidence from... Any live evidence from Ms. Connors either, if I can finish. The trial court didn't hear any evidence from Ms. Connors either, and so the significant thing that would impact a jury's decision making is to know that a well meaning eyewitness can make a decision wrongfully. And so, for example, once there's post information and feedback, it's sort of like you take red and yellow and it makes orange. You can't take orange and then bring them back to red and yellow again. And so that's the social science aspect that the court missed. It didn't cite Lerma, and neither is the state... What effect does it have that these two pictures didn't look alike? I mean, the trial court seemed to make a big deal about that, that these two pictures, the 19 year old picture and the 32 year old picture, didn't look alike to the extent that Loftus couldn't even identify them as being the same person. So as far as that, I think the inference cuts the other way. In terms of the science, which... What happened here is exactly what the Illinois Supreme Court in Lerma addressed, where the trial court sort of said, this is my late friend, Dr. Loftus' testimony, that once there is that post information feedback and there's the suggestive procedures, as I was sort of just saying, you can't unbake the cake. And Dr. Loftus testified specifically about the issue that the court is inquiring of, whether or not that there's a difference between the two pictures, and that would still constitute post event information. And further, I think it's at the very end of the redirect, Dr. Loftus is asked, to what extent does the fact that Ms. Connors was willing to select a picture of a 19 year old when she described somebody who was in their early 40s or late 30s. And that actually shows evidence of the continued impact of the suggestibility, because this was extremely suggestive. A single picture, walking into a grand jury, and then shown that picture again just months before. Let me ask you a follow up question. Ms. Connors obviously testified at the original trial that she met. Correct. Wasn't she extensively cross examined by her identification? She was. And that... The issue is that, and this is why eyewitness testimony is so important and so powerful, is because it's highly counterintuitive. Lay jurors believe if something dramatically stressful happens to you, if it's a terrible incident that happens, you're going to have this quote seared in your mind forever. But what we have learned through social science and through the exonerations of other individuals around the country, is that that's simply not the case. And this is in the record, there's numerous cases in very heinous crimes, and it's terrible that this happened to anybody. And it's terrible what happened to Mr. Foxworth. Many of the cases involved single assailant rape victims, who spent an hour, half an hour with the perpetrator and say, I know who that person is. And they were simply wrong. And that's why this evidence is so important, because it's not about the cross examination, it's about what lay jurors would believe. So when you couple the social science with the DNA, and also the other evidence I haven't had a chance to discuss concerning undermining the state's motive theory for the crime, which is what it relied on in the direct appeal, we believe that Williford is entitled to have his conviction vacated and a new trial with us to be presented. Thank you, Mr. Olson. You will have time for a rebuttal argument. Ms. Burns, you may proceed. Good morning, Your Honors. May it please the court, my name is Marigot Burns, and I represent the people of the state of Illinois. We come before this court this morning to respectfully ask you to affirm the post conviction court's determination, after a third stage hearing, that the defendant had not proven any of his allegations. Initially, I would like to talk... Initially, I felt what the court was speaking about most recently, which is the identification. And the post conviction court essentially found Dr. Loftus not particularly persuasive, in part because Dr. Loftus had never interviewed the witness and had not seriously considered the nature of her testimony in context. Isn't this new evidence building light of the Lorman case? Shouldn't they be allowed to put on this expert? I'm sorry, pardon me? Isn't this new evidence in light of the Lorman case, should they not be allowed to put on this expert? And if not... Well, they put him on at the third stage hearing, which was an appropriate place to put him on. But the post conviction court, as a trier of fact, did not find the evidence particularly moving. And again, in part because of the nature of Delia Conner's testimony. When she was first shown the picture of the defendant at age 19, she specifically said, well, yes, that's him, but he's a lot younger and a lot smaller than when I saw him. So she was able to discern the difference in what the picture portrayed versus what she had seen herself. Wouldn't you agree though that that procedure is inherently suggestive? You know, it's hard to think it through, because normally when you talk about suggestive show ups and things, it's things that happen, like say the same night, the police take the witness to the side of the road where they've arrested somebody and they show him. I understand that. This is like several... This was months later. Well, the suggestive nature isn't the time frame, it's the one person. I mean, going back to the Blumenshine case, the Supreme Court in 1969, recognized the inherent nature, inherent suggestiveness of a one person or a one picture show up. It doesn't matter about the timing of it. Well, and I guess my thought would be, to the extent we'd be talking about something suggestive, it would have to have been something that was closer to what she actually would have seen. A picture that was about 10 years old was not going to be close to what she had seen, and she was able to discern that when she saw it. She's like, yes, this is the guy, but it's a lot younger and a lot smaller than the guy that I saw. So I think that to the extent that it was suggestive, because it was one person, she was able to discern the difference in the picture that she saw versus what she saw in person at the event. You know, I asked counsel also why Connors was not interviewed by Dr. Loftus. I was wondering about that myself. And his response, as you heard it, was that the state of the art, the protocol, recommends not doing that. What is your response to his response to my question? I guess I don't know enough about the nature of the protocol. I will say that I have an inherent bias against this type of thing, going back to having done a great many child cases, and you have people say that children can only say something that occurred by their birthday or by Christmas and this type of thing. And I find much of this stuff, when it is done unrelated to the individual involved, to be unpersuasive. And part of it is... That would go to the wake though. I mean, isn't this new evidence that could be considered? I guess it's new evidence that could be considered, assuming that it meets the standard of review to get relief at a third stage hearing. And I don't think that... Well, why doesn't it? It's applied to this witness. I don't think it meets the standard. Not only because the expert did not talk to her personally, but also because the expert seemed not to understand that she made discerning choices, both when shown the initial picture, and then three years later, when shown the photo array. When she saw the photo array of, I believe it was five light skinned African Americans, she picked two as looking like the defendant, and then rejected one because his face was too broad. That's a rational way of discerning between the two people who looked like the person that she saw, and at that point, looked more like the person that she saw because they were closer in age to him. How long was she in contact with the defendant, and how far were they from each other? A good chunk of time, because she had been in the victim's bedroom watching TV, and the defendant came in to the room, which was lit by a lamp, and spoke to her there, and then spoke to her in the kitchen, which was a small and more brightly lit room. And they spoke for a few minutes, apparently before the other two assailants threw the victim into the kitchen, and she then observed the defendant take the victim, and she observed all three of the assailants strike him with the board. And apparently, the last one to strike him with the board was the defendant, and the defendant then left to go out and get the gas can. While he was gone, the smaller of the two assailants told her he wanted her jewelry or something. And at some point during this period, the defendant and the smaller of the assailants went upstairs and ransacked the upstairs of the house. And during the course of the discussion among all three of them, the victim kept saying, I thought I had until February 10th. I thought that I could pay you then. And so she saw the interaction among the victim and the three assailants. The one that she... But what time period, then? I mean, I don't know if you're... I don't... Mr. Shostak's question, how long did she testify the defendant was in her presence at that time? I don't know if there's actually a discussion of the actual time. I think that you're probably looking at segments of several moments at a time. She was never asked at trial how long the defendant was in her presence. I apologize, Your Honor. I'm doing this off brief, and so I did not read the entire trial. And so I apologize. If that's in the trial, I don't have the information. But wouldn't that be relevant and important to know? I'm sorry? Wouldn't that be relevant and important to know that? I think it's relevant, but I think that, again, it's a context issue. We know that she saw him in the bedroom. We know that when he took her from the bedroom to the kitchen, she was very close to him and saw his face. Well, I know that. And you did a good job of explaining the circumstances. But whether you see somebody for a fleeting moment or you see somebody for 15 or 20 minutes, it doesn't make a difference, does it? You're arguing that the biggest factors favor reliability, number one, is how much time were you with those? What was your opportunity to observe? Well, in her... Again, the post-conviction court found that the first two biggest factors found in her favor, that she had a significant opportunity to see them. And again, I don't know if the specific amount of time was discussed. I do know that she saw him during the course of conversation in more than one room, in more than one circumstance, all throughout the entire circumstance of the event. Let's go back to DNA evidence for a moment. Yes. Obviously, as counsel alluded to, there was testimony, additional DNA samples were taken involving uncovering several profiles of other people, including somebody who was connected to another man's crime. So despite all of this additional testing, the defendant's DNA was not connected to the murder incident, correct? Correct. Doesn't that at least allow an inference that he may not have been there? It's hard to draw that... I think it's hard to draw that inference where you've got an offense that was committed by three different people in January, so some of them may have had gloves on, but likely they were not sweating. Touched DNA is not something that is left typically in murders. I've been doing this for 30 years and I rarely see touched DNA from the perpetrator of a murder. To the extent that this board had... Well, again, the bulk of what was on the board was the victim's blood, but there were other things on the board. Apparently, if I get the story straight, during the course of a task force investigation later in time, a person who had sold drugs with the victim said that the victim had two 2x4s that he used to block the door. So we have no idea when anything was deposited on these boards, whose it was, how many people had access to it, and whether it was prior to the night of the murder or after the night of the murder. We know that once they had discovered that there was more DNA, they did exclusion tests of court personnel, and I believe... I think the bailiffs and different people who had handled it to find out that if it had not been deposited in court when it was shown to the jury. But again, there isn't any time frame for when they were handled. There's no time frame for how long this 2x4 was at the defendant's residence, and how many people touched it after it was removed from the defendant's residence. You're asking us to affirm the trial court's denial of the defendant's petition, his claim of actual innocence. Yes. Considering the standard of review, can you tell us specifically why we should deny it, considering the standard of review? The standard of review is new, non cumulative evidence that is exonerating. And how does it not meet that standard? How does it not meet that standard? To the extent that there was limited DNA testing prior to the trial, and it excluded the defendant. The trier of fact at all times knew that there was no DNA connecting the defendant to the offense. To the extent that, according to the report that was done subsequently, there is a possible link to another famous murder. But again, there's no way of knowing when this was deposited, by whom it was deposited. Unfortunately, we have two other cases. One has the assailant in the original murder. The murder to which this is supposedly connected, occurred seven years before this murder. So it's hard to see how this is exonerating as to the defendant, who we have no reason to believe even touching these things. And I believe it's not... I apologize for interrupting myself. At some point, there was an expert who testified as to how rare it is to have decent prints from gas cans, because apparently the fumes interrupt the DNA. So the fact that there's nothing on the gas can linking the defendant is not exonerating. And the fact... You keep saying exonerating. I mean, the issue is conclusive, not exonerating. And conclusive means probably result in a different result, correct? Yes. It's not... It doesn't have to be absolutely exonerating evidence. It has to be conclusive. I'm sorry, Your Honor. I'm old. I keep thinking of Washington. I apologize. I'm just saying... But I think that to the extent that we're talking about a probability, I don't think in the context of the evidence presented, there is a legitimate probability here. The fact that the defendant continues to be excluded from the DNA on a January night when he may have been wearing gloves, a deal you couldn't remember, is simply not remarkable. You know, if you have each one of your arguments separately, as it relates to these two that we've argued and also the motive, which nobody's argued yet, but we certainly understand the argument. If you look at all three of them separately, your argument has certainly some appeal. The question now is when you put all that together and they argue the cumulative nature of those arguments would result in conclusive evidence. I don't think the cumulative nature is particularly weighty. Again, the post conviction court's rejection of Dr. Loft's testimony was based on the actual circumstances of the offense, as well as the weaknesses of his testimony, which included not only not interviewing Ms. Connors, but also himself not being able to pick out the picture of the defendant when he knew the picture was there. So again, one has to question the validity of his interpretation of the science, at least as to this case. In that sense, it relates to the suggestive nature, but you have the separate component of the doctor being able to testify just generally to how social science has evolved as it relates to identification testimony. Again, in general, not necessarily either related to the suggestive nature of the case. And again, I may be the worst person to be having this discussion because I'm so inherently unpersuaded by this type of evidence. I think this entire panel probably has ruled on cases pre-LURMA, I know I have, I shouldn't speak for everybody else, and not allowed this evidence in based on the questions that we all had regarding this social science evidence. But now we're talking post-LURMA, it's a different ballgame. Assuming it's a different ballgame, I think that, I believe that there still has to be a level of reliability in the social science testimony that's going to be presented to a trier of fact. Not just general reliability, but reliability of this particular case. Right. Thank you, Your Honors. Thank you, Ms. Brooks. Mr. O, would you like to speak? I wanna try to make four points really quickly. And first about the DNA. Something that I should have mentioned earlier was that the DNA on the board that is linked to Holly Staker and Stain D and those things that you talked about, those were extractions from the retained swab done from the initial testing. That was all collected before trial, and that is the DNA evidence that we're... So I just wanted to emphasize that. Before trial. Before trial. The original trial. Before the original trial, yes. So when the DNA hit happen, that was when they had the samples in the lab, re extracted them, we have more sensitive technology now, and that's where they found the DNA. When the trial court was talking about the post trial handling of the exhibits, wasn't he talking about the gas can? He was talking about the gas can. And so there's a question, as I think the state mentioned, we did try to do some elimination standards. We don't actually know that the... When I saw the gas can, it was in a box. I don't know that the jury had the opportunity to remove it from that box. The assistant state's attorneys, they were part of the elimination standards. And all of this goes to, there is DNA there, it's not Williford's. So I wanted to mention that. As it relates to the link to the Holly Staker case, we argued this in our brief on pages 22 and 23 of the opening brief, that Mr. Williford would have a right to point to an alternative suspect, and that the evidence here is certainly relevant. It's collected from the crime scene evidence. It's not speculative in the way that it's coming out of nowhere. And so he would have a right to present that. As it relates to... Wait, wait, wait. He'd have a right to present that it was tied to another case? Yes, sir. What's the relevance of that when we have three perpetrators here, and the fact that the defendant may or may not have associated... The Staker case was a very violent crime. And this was a very violent crime. So the fact that the same person is involved in a very violent crime is really not that shocking or unusual. Well, we do think it's shocking when you consider Mr. Williford, who has never been involved in a violent crime, who has no criminal history that he was impeached with. And, for example, is if the DNA went the other way. Let's say it was a DNA hit to Mr. Williford's best friend. And then Degorski is a case that we cited below, where they said, yeah, your DNA's not there, but your best friend was there. And because who that other person is that matters. In Peeble versus Davis, the DNA hit not only excluded Mr. Davis, but it linked to another individual, Maurice Tucker. Maurice Tucker was an individual who lived at the home where the victim was. So that other person, the information that we have about that other person matters, and I think is significant here, in that Williford would have the right to argue that the other people who were there, their DNA, that they committed the offense. And if we knew who that person was, we would be able to present additional evidence about them. As it relates to... Is that a trial within a trial, basically? No, Your Honor. And so there was an offer of proof on this issue below. And I think that the court... This is something that could be worked out via stipulation, in large part, to say a DNA profile was taken from this particular case, this is the type of testing that it was done, this is the... And I don't think that it would at all result in a trial within a trial, because a lot of it is in a DNA association between a case. So you would actually have some of the same people who already testified here. It's only a few more questions to lay the facts to the identification. The social science impacts the way in which we assess the reliability. So the court asked a few questions about how long was Ms. Connors with T? One, we don't know. It was never directly asked at the trial. And two, more important, the social science tells us that even if, let's say it was objectively 20 minutes that they were in the same building, that the functional duration of opportunity to memorize the perpetrator's face to make an identification would be reduced by a lot of other factors. For example, the stress of the event, the fact that there were multiple perpetrators, she's divided, and the fact that as a human being in a very violent situation, she would be more likely to focus on her own survival as opposed to memorizing the identification. And this actually bears out in what happened with Ms. Connors. Her descriptions of the perpetrator, T, were very vague. That the night it was a black man, then it was a black man with no facial hair. Willingford has always had facial hair. And so her descriptions were vague. Tellingly, her descriptions of the other two perpetrators were more robust. And so the social... So wasn't there cross examination on that? There was cross examination with respect to the description. But of course, the situation is completely different if you look at it from the lens of how would the social science impact that? Because what Dr. Loftus testified to, the functional duration, despite the absolute amount of time of a witness's opportunity to observe the person's identity, would become low because of all of these factors. And these factors, and why there's manifest error here with respect to the biggest factors of which the state bears the burden, is because the court didn't consider any of these other things that are unrebutted and accepted now in the social science. For example, stress, the attention, and all of these other things. And also, last, is the opportunity, is the way in which the suggestiveness contaminated the witnesses' later attestation of confidence. So do you anticipate that the biggest factors are gonna expand now in light of cases that are gonna come down the road? The way I think of it, Your Honor, is that the social science evidence guides us to how we should look at and evaluate those biggest factors. And what I would say, and it's been the case since Manson and Stovall and even Waite, it's about the totality of the circumstance. Now, today, in light of what we know, we evaluate those factors differently. So for example, it was thought, Oh, confidence matters. Confidence is the biggest thing. It turns out it's more nuanced than that. If there's inherently suggestive show up that happens at the beginning, then confidence sort of goes out the window. However, if... And this is Wickstead and Wells, 2017, it's cited in our brief, and I can cite it as supplemental authority. If there's a fair administration at the initial procedure, like a double line, sequential line up, then the confidence does mean something. Here... So it's a matter of how you look at it. It's a matter of how you... Not necessarily expanding the number of factors. Correct, Your Honor. I just have one final question. You talk in your brief about speculative... The trial court's speculative concerns at page 24 of your brief, going to the weight a jury might afford the evidence. Isn't that what the trial judge is supposed to do in a third-stage post-conviction hearing, is to, when determining the conclusive nature of the evidence, to make a determination of the weight a jury would give to this evidence? I'm glad that the Court asked that question. Well, I'm glad I asked it, too, but I'm just wondering if that's a little bit of a... You're misconstruing in that statement in your brief as far as what the trial court was... I mean, how we're supposed to view the trial court's actions. Well, I think that the reason that the trial court committed manifest error here is because the court didn't consider all of the evidence. The court didn't consider how Lerman identification applies. The court didn't consider the link to another case. The court didn't consider the 2003 confrontation and how that would have impacted Delia Connors later testimony, even though it was completely undisputed below. And the police report about that confrontation is in the record and was admitted as an exhibit. So when you get to assessing all of this evidence cumulatively, one, the trial court needed to consider all of the evidence. And then I think the second issue here, and it goes to the court's response to something the State said, is that the standard of review, this is about probability. And tellingly, the court actually cited that old language that's been... From Barnes-Slatter about whether it must completely and absolutely exonerate somebody. Coleman says our standard of review is low, it's probabilistic. And this court, I think, did a great job in the Rivera case of saying, yes, we know that DNA doesn't trump everything else, but it does cast... When it goes to the ultimate issue, when it does cast a reasonable doubt in light of the evidence that was presented at trial, that does entitle a defendant to a new trial. And that, we believe we've met that standard here. Because Williford's DNA is not there. The social science says the only evidence implicating him in this crime is likely unreliable, and the whole case would look different today than it did then. And I thank you for your time. All right. This panel would like to thank the attorneys in this case for the quality of the arguments here today. The case will be taken under advisement with a decision rendered in due course. We stand in recess until our one o'clock hearing.